## Case No. 11,069.

### PHELAN v. IRON MOUNTAIN BANK.

[4 Dill. 88; 16 N. B. R. 308; 5 Cent. Law J. 351.] [1]

Circuit Court, E. D. Missouri. Sept. Term, 1877.

BANKRUPT ACT—PREFERENCES—DEPOSITS MADE WITH BANKRUPT BANK TO MEET ITS CHECKS IN CLEARING-HOUSE NOT A TRUST FUND.

1. Where a bank agreed to act as the agent of another bank for clearing-house purposes, and, as such agent, agreed to pay all the checks of the latter which came through the clearing-house, and received for that purpose, from time to time, the funds of the latter bank, which it passed to the credit of the latter bank, without keeping such funds separate from its own: Held, that the relation of debtor and creditor—the ordinary one of the bank to its depositors—was created, and that the deposits could not be considered as trust funds, which, on failure of the former bank, would not pass to its assignee.

2. Under such circumstances, the funds, when deposited, became the property of the bank receiving the same, freed of any trust character; and where the bank that received and credited such deposits paid, on the day of its failure, the amount thereof to the bank which made the deposit, the latter bank having knowledge of the insolvent condition of the former bank, such payment is an illegal preference, which may be recovered by the assignee in bankruptcy.

[Cited in brief in Drovers' Nat. Bank v. O'Hare, 119 Ill. 649, 10 N. E. 361.]

[Error to the district court of the United States for the Eastern district of Missouri.]

This was an action by Phelan, assignee in bankruptcy of the Central Savings Bank, against the Iron Mountain Bank, to recover the amount of an alleged illegal preference. The cause was submitted on an agreed statement of facts, and judgment was rendered by the district court for the plaintiff. The defendant sued out a writ of error. The bank-

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission. 5 Cent. Law J. 351, contains only a partial report.]

rupt act provides that "no property held by the bankrupt in trust shall pass by the assignment." Rev. St. § 5053. The main question in the case arose under this provision. The material facts are stated in the opinion.

Mr. Broadhead, with Donavan & Conroy, for plaintiff, cited Bank of Commerce v. Russell [Case No. 884]; In re Hosie [Id. 6,711]; In re Janeway [Id. 7,208].

Wood & Whitney, with E. T. Farish, for defendant, cited: Perry, Trusts, pars. 2, 18–24; Voight v. Lewis [Case No. 16,989]; Ex parte Sayers, 5 Ves. 172; Grant, Banks, 4, 5; Morse, Banks, p. 26, c. 2. As to following trust funds into hands of an assignee: Cook v. Tullis, 18 Wall. [85 U. S.] 342; Brocchus v. Morgan, 5 Cent. Law J. 53; Ex parte Hobbs [Case No. 6,549]; Hamilton v. National Loan Bank [Id. 5,987].

MILLER, Circuit Justice (orally). This case was submitted upon an agreed statement of facts, from which it appears that before the Central Savings Bank, of this city, went into bankruptcy, when Mr. Phelan became its assignee, there was an arrangement between it and the Iron Mountain Bank by which the Central Savings Bank acted as the agent of the Iron Mountain Bank for clearinghouse purposes, the latter being incapable of entering that association for want of sufficient capital. By the agreed statement of facts made up between the parties and submitted to the court, it appears that the Iron Mountain Bank undertook to keep on deposit with the Central Savings Bank a sum sufficient to meet all its checks which that bank should be called upon to put through the clearing-house, and that in the main it did so. And it appears that the Central Savings Bank came under an obligation to the Iron Mountain Bank by which it agreed to pay all the checks of the latter, whether it had money enough of the latter to meet the checks or not; it had to assume that obligation when it agreed to become the agent of the other bank for the discharge of the checks in that way. Through a considerable course of business, the Iron Mountain Bank had at times on deposit with the Central Savings Bank more money than was necessary to pay those checks, and at times less money, but the Central Savings Bank always met those obligations. The Central Savings Bank kept a regular account with the Iron Mountain Bank, debtor and creditor, as it was bound to do, in regard to the transactions. The Central Savings Bank did not keep the funds furnished for that purpose separate and distinct from other funds, but merely passed the amount to the defendant's credit. When the Central Savings Bank failed, or knew that it was going to fail, and after banking hours, it found that it had in its possession, beyond what was necessary to pay the checks of that day, some $12,000 or $15,000 on de-

posit of the Iron Mountain Bank, and it gave them notice to come in and withdraw these deposits, as they would not on the next day protect their checks in the clearing-house. They did come in, and after banking hours the Central Savings Bank paid out, in money and checks, all the deposits of the Iron Mountain Bank.

It is claimed that this was a preference to one of the creditors of the Central Savings Bank, and that the Iron Mountain Bank knew that the Central Savings Bank was in an insolvent and failing condition; and, conceding this knowledge, the only question before the court is whether that was a preference within the meaning of the statute. A very ingenious argument is made by the able counsel, Mr. Wood, to prove that this was some kind of a trust fund, a special trust deposit, which it was the duty of the bank to protect from its general creditors, and turn over to the cestui que trust, which was the Iron Mountain Bank.

I am not able to see, from the facts in this case, that the transaction possessed that character. I do not perceive any difference between that deposit and the deposit of any individual doing business with the Central Savings Bank. No special trust relation was created by this transaction in question. It does not follow, because a fund is placed in the hands of a man or corporation, that it can be followed everywhere, under all circumstances. And in this particular case there was no means of following specifically the money which was placed by the Iron Mountain Bank in the hands of the Central Savings Bank, because it went into the bank as other money did, was mingled with other money, and paid out in its ordinary business as other money was. There is another consideration which shows that relation between the parties. Why is it that a bank in this or any other city provides clerks to keep accounts, provides and furnishes its depositors a check-book, and goes to a great deal of trouble and expense and liability in securing them against the loss by fire or thieves? Why is it that they do these things, and some go further and pay interest for the privilege of having and holding the money? It is because it becomes their money; because the moment it is deposited there it is their money, and that they may make money out of it in the regular banking business. In this case, the Central Savings Bank not only consented to pay the checks of the Iron Mountain Bank which were drawn against it, but undertook, in addition to what an ordinary bank does, to take care of and protect its operations in the clearing-house. What was it to get for all this? According to the theory of the plaintiff's counsel, Mr. Wood, they were to hold this fund as a separate and distinct trust fund, with which they could make no operations, which they could not loan out, and

which they were to hold until exhausted by checks; and they were to do this for nothing.

The case of the Marine Bank v. Fulton Bank, 2 Wall. [69 U. S.] 252, in which I had the honor of delivering the opinion of the supreme court, is in point, and is decisive of the case at bar. In that case, the Fulton Bank sent to the Marine Bank, of Chicago, two notes for collection. The currency at Chicago had at that time become deranged, and consisted exclusively of bills of Illinois banks. The Marine Bank sent a circular to its correspondents informing them that in the disturbed state of the currency, it would be impossible to continue remittances with the usual regularity, and that it would be compelled to place all funds received in payment of collections to the credit of its correspondents in such currency as was received in Chicago—bills of the Illinois stock banks—to be drawn for in like bills.

The notes were collected by the Marine Bank and placed to the credit of the Fulton Bank. About a year after the collection made, the New York bank made a demand of payment from the Chicago bank, which was refused, unless the former bank would accept the Illinois currency, now sunk fifty per cent below par. The Marine Bank was engaged, like other banks, in receiving deposits, lending money, buying and selling exchange, and the money collected on the two notes in question was not retained in any separate or specific form. The court held that the proceeds of the notes, when collected, became the money of the collecting bank, and that the depreciation in the currency fell upon that bank. The court, in deciding that case, said:

"But the truth undoubtedly is, as stated in the second branch of the proposition, that both parties understood that, when the money was collected, plaintiff was to have credit with the defendant for the amount of the collections, and that the defendant would use the money in his business. Thus the defendant was guilty of no wrong in using the money, because it had become its owner. It was used by the bank in the same manner that it used the money deposited with it that day by city customers, and the relation between the two banks was the same as that between the Chicago bank and its city depositors. It would be a waste of argument to attempt to prove that this was a debtor and creditor relation."

In the case at bar, I cannot see that the relation between the banks was any other than one of ordinary deposit, by which the Central Savings Bank became the debtor of the Iron Mountain Bank, and liable to pay its drafts through the clearing-house. It follows that the assignee is entitled to recover; and the judgment of the district court, being in conformity with these views, is affirmed. Affirmed.